**ELITE LICENSING, INC., Plaintiff,**

v.

**THOMAS PLASTICS, INC. d/b/a Merchandising Resources, Inc.; Larry Schwarz; Mimet, S.A.; Mimet USA, LLC; the Linder Group; and Nathan Linder, Defendants.**

**No. 02 Civ. 4847(SAS).**

United States District Court, S.D. New York.

March 17, 2003.

for relief.

Martin B. Pavane, Myron Cohen, Roger S. Thompson, Cohen, Pontani, Lieberman & Pavane, New York City, for Plaintiff.

Arthur M. Lieberman, Abbey Green, Lieberman & Nowak, LLP, New York City, Richard Ross, Davie, FL, for Defendants.

### MEMORANDUM OPINION AND ORDER

SCHEINDLIN, District Judge.

This is an action for infringement of United States Patent No. 5,813,569

("the '569 Patent") for a point-of-sale merchandiser ("merchandiser"). A merchandiser dispenses cooled products (*e.g.*, soda cans) at the point of sale, usually at checkout counters in delicatessens or supermarkets, and is commonly referred to as a "pop-up cooler".

Defendant Thomas Plastics, Inc. ("TPI") the manufacturer of the merchandisers, had an exclusive license with plaintiff Elite Licensing, Inc. ("Elite"), the patent owner, to sell merchandisers. The license expired on July 27, 2001. Elite alleges that TPI has continued to sell merchandisers covered by the '569 Patent.

Elite has filed a motion for a preliminary injunction, seeking to enjoin further sales of TPI's merchandisers. An evidentiary hearing was held on February 7, 2003 and February 21, 2003. For the reasons set forth below, plaintiff's motion for a preliminary injunction is granted.

## I. FACTS

The following facts are uncontested, unless indicated otherwise.

From approximately June through December 1995, Elite Marketing Ltd., a predecessor-in-interest to Elite, employed Lawrence Cihanek. *See* 2/5/03 Supplemental Declaration of Moshe Horowitz, president of Elite ("Horowitz Supp. Dec."), Defendants' Exhibit ("Def.Ex.") 16, ¶ 3. As a condition of employment, Elite Marketing required all of its employees hired after May 15, 1995, to sign an employment agreement entitled "General Terms of Engagement" ("the Engagement document"), which gave Elite Marketing rights to products developed by the company and its

employees.[1] *See id.;* Tr. at 66 (Hanze). According to Elite, the document was signed by Cihanek in the presence of Hanze. *See* 8/17/95 General Terms of Engagement, Plaintiff's Exhibit ("Pl.Ex.") 11 (signature illegible); 2/03/03 Declaration of George Hanze ("Hanze Dec."), Def. Ex. 12, ¶¶ 4, 5 (attesting to having witnessed Cihanek sign the document); Horowitz Supp. Dec. ¶ 4; Tr. at 65, 67 (Hanze).[2]

Elite alleges that the merchandiser at issue in this case was developed during Cihanek's employment at Elite Marketing. Elite Marketing retained patent counsel to prepare and file design and utility patent applications for the invention, each of which named Cihanek as the inventor. *See* Horowitz Supp. Dec. ¶ 5. On November 2, 1995, Cihanek signed the design application. *See* Declaration and Power of Attorney for Patent Application, Ex. D to 2/6/03 Supplemental Declaration of Roger Thompson ("Thompson Supp. Dec."), counsel for Elite. Also on that date, Cihanek signed an Assignment transferring his rights in the design application to Elite Marketing. *See* 11/2/95 Assignment, Pl. Ex. 12; *see also* Tr. at 15 (Cihanek).

The utility patent application was not ready for signature until December 1995, by which time Elite Marketing had fired Cihanek. *See* Horowitz Supp. Dec. ¶ 6. Because the United States Patent and Trademark Office ("PTO") Rules require that an effort be made to obtain the inventor's signature to a patent application, *see* 37 C.F.R. § 1.47(b), Horowitz called Cihanek and asked him to review and sign the application, but Cihanek refused. *See*

---

1. The Engagement document was not ready until August 1995. However, all employees hired after May 15, 1995, were told they were required to sign the document when it became available. *See* Transcript of 2/21/03 Preliminary Injunction Hearing ("Tr.") at 67

(George Hanze, Elite Marketing's Executive Vice President).

2. Cihanek denies signing the document. *See infra* Part IV.A.2.a (finding Cihanek's denial lacks credibility).

Horowitz Supp. Dec. ¶ 8. On December 29, 1995, Cihanek filed in his own name the utility patent application that Elite Marketing had prepared, *see* 12/27/95 Patent Application, Def. Ex. 5, which was ultimately abandoned due to Cihanek's failure to respond timely to communications from the PTO. *See* 2/15/02 Affidavit of Lawrence Cihanek ("Cihanek Aff."), Ex. 2 to Defendants' Response in Opposition to Motion for Preliminary Injunction ("Def.Mem."), ¶ 8; Tr. at 17–18, 37 (Cihanek).

On March 12, 1996, Elite Marketing filed a patent application with the PTO for a point-of-sale merchandiser, naming Lawrence Cihanek as the sole inventor. *See* Def. Mem. at 2. Horowitz filed a declaration under oath with the PTO stating that Cihanek had refused to execute the required declaration of inventorship, but that Cihanek had conveyed ownership rights in the invention to Elite Marketing. *See* 3/8/96 Declaration of Moshe Horowitz, Ex. 1 to Def. Mem. Attached to the declaration, were a copy of Cihanek's Engagement document and W–4 form. *See* Horowitz Supp. Dec. ¶ 8. Upon this declaration, Elite Marketing claimed ownership in the '569 Patent.

The PTO accepted Elite Marketing's filing, *see* 2/14/97 PTO Decision According Status Under 37 C.F.R. § 1.47(b), Ex. M to Thompson Supp. Dec., and sent Cihanek a letter informing him that a patent application naming him as inventor had been filed and that he had the right to participate in the PTO proceedings concerning the application, *see* 2/14/97 Letter to Cihanek from Karin Tyson, Legal Advisor to the PTO, Ex. A to Thompson Supp. Dec. Cihanek never exercised his right to par-

ticipate in the application process. *See* Prosecution History of the '569 Patent, Ex. 10 to Def. Mem. (file history devoid of any correspondence to the PTO from Cihanek).

On or about May 5, 1997, Elite Marketing sold its rights to the application for the '569 Patent to plaintiff Elite. *See* Horowitz Supp. Dec. ¶ 9. On July 27, 1997, Elite negotiated an exclusive license to manufacture, use, and sell the subject matter of the patent application with Merchandising Resources Inc. ("MRI"), an affiliate of TPI.[3] *See* Licensing Agreement ("License"), Def. Ex. 14. TPI guaranteed MRI's payments under the license. *See* 12/18/02 Declaration of Moshe Horowitz ("Horowitz Dec.") ¶ 5. On January 1, 2000, the license was amended to name TPI as the exclusive licensee. *See id.* ¶ 8.

TPI claims that when it attempted to prototype the subject matter described in the patent application, the merchandiser did not function in a commercially acceptable way. *See* Schwarz Dec. ¶ 4.; Tr. at 140 (Schwarz). As designed, Claim 15 of the patent requires cooled air to be blown upward through a partition,[4] where it interacts with the warm air on the inside of the glass door, causing condensation to form on the glass, which obscures the customers' view of the product inside the device. *See* Schwarz Dec. ¶ 4; Tr. at 140 (Schwarz). TPI alleges that, to overcome this problem, it redirected the air flow and changed the position of the fans. *See* Schwarz Dec. ¶ 5; Tr. at 140 (Schwarz).

During the four-year term of the license, TPI and MRI collectively sold over

---

**3.** According to Larry Schwarz, president of TPI, Horowitz never disclosed any details about obtaining the '569 Patent. *See* 1/22/03 Declaration of Larry Schwarz ("Schwarz Dec."), Ex. 3 to Def. Mem. ¶ 3.

**4.** The partition divides the interior chamber into two sections—an air plenum on one side and a rack-receiving chamber on the other side. *See* '569 Patent, Ex. 1 to Pl. Mem., at column 8, lines 12–18.

$61,000,000 worth of merchandisers and paid over $3,600,000 in royalties to Elite for those sales. *See* Sales Subject to Licensing, Def. Ex. 11; Horowitz Dec. ¶ 10. The merchandisers sold under the license were marked with the number of the '569 Patent. *See* Horowitz Dec. ¶ 12; *see also* Photograph of Label Affixed to Merchandiser, Ex. E to 12/19/02 Declaration of Roger Thompson ("Thompson Dec."); Tr. at 91 (Edward Tombs, former president of MRI).

In May 1999, after Cihanek learned that Elite was profiting from his pop-up cooler invention, Cihanek hired an attorney, Charles Temko. *See* Tr. at 18–19 (Cihanek). Temko contacted Elite's counsel claiming that Cihanek had never signed the Engagement document and that the idea for the merchandiser had been developed prior to Cihanek's employment at Elite Marketing. *See* 5/27/99 Letter from Temko to Martin B. Pavane, counsel for Elite, Pl.Ex. 3. Temko additionally claimed that Cihanek should be paid monies beyond what Elite Marketing had paid him while he was employed. *See id.* On August 12, 1999, Elite and Cihanek entered into a confidential settlement agreement, pursuant to which Elite paid Cihanek $142,000[5] and Cihanek agreed that he would not challenge the '569 Patent or voluntarily assist anyone else in such efforts. *See* Schwarz Dec. ¶ 10; 8/12/99 Agreement between Horowitz and Cihanek ("8/12/99 Settlement Agreement"), Pl.Ex. 4; Tr. at 45 (Cihanek). Also on that date, Cihanek signed an Assignment transferring all of his rights in the '569 Patent to Elite, *see* 8/12/99 Assignment, Pl.Ex. 5; Tr. at 46 (Cihanek), which was filed with

the PTO on August 30, 1999, *see* PTO Notice of Recordation of Assignment Document, Ex. J to Thompson Supp. Dec.

When TPI's license expired, TPI sought to renew it, but no renewal agreement was effected because the parties could not agree on the terms. *See* Horowitz Dec. ¶ 14. On January 9, 2002, Elite and TPI entered into a written agreement that permitted TPI to make one final sale of the licensed merchandisers and required TPI to discontinue selling the patented merchandisers thereafter. *See* 1/9/02 Letter from Horowitz to Schwarz re Settlement of Dispute over Licensing Agreement ("1/9/02 Settlement Agreement"), Pl.Ex. 26 (acknowledging that TPI will not, without Elite's consent, "sell any pop-up coolers utilizing Elite's patent to anyone else"). In February 2002, Elite entered into a new license agreement for the merchandisers covered by the '569 Patent with ATC Group, Inc. ("ATC"), a company founded by Tombs. *See* Horowitz Dec. ¶ 16; Schwarz Dec. ¶ 7; Tr. at 78 (Tombs).

Despite having assigned his rights in the '569 Patent to Elite, and despite having promised in the August 12, 1999 Settlement Agreement not to challenge the '569 Patent, Cihanek signed an affidavit on February 15, 2002, claiming that: (1) he never signed the Engagement document; (2) he did not convey any ownership interest in his invention to Elite Marketing from the filing date of the patent application on March 12, 1996 to the issue date on September 29, 1998; (3) Horowitz and Elite Marketing submitted false ownership information to the PTO in order to obtain a patent on his invention; and (4) the

---

5. Horowitz claims that he agreed to share some of Elite's success with Cihanek because he knew that "Cihanek had invented the merchandiser, and that he was unhappy because

he had not shared in the phenomenal success Elite was having with it." Horowitz Supp. Decl. ¶ 10.

invention disclosed in the '569 Patent was invented prior to his engagement with Elite Marketing.[6] *See* Cihanek Aff. ¶¶ 4, 5, 7, 8; *see also* Tr. at 11–12, 31 (Cihanek).[7] Elite contends that Cihanek's breach of the Settlement Agreement was in return for "some undisclosed remuneration."[8] *See* Elite's Reply Memorandum of Law in Support of Motion for Preliminary Injunction ("Pl.Rep.Mem.") at 7.

In late May 2002, Elite learned from Nathan Linder, a sales representative for TPI, that TPI was still selling the patented merchandisers and claiming that it retained exclusive rights to do so under the '569 Patent.[9] *See* Horowitz Dec. ¶ 18. Elite alleges that TPI's continuing sale of the merchandisers has "put [it] out of business" because ATC has been unable to secure customers. *See* 12/18/02 Declaration of Edward Tombs ("Tombs Dec.") ¶¶ 16–17 (stating that potential domestic customers have indicated that they will continue to use TPI as their supplier until TPI is no longer allowed to sell them the accused merchandiser); Tr. at 79–80 (Tombs) (stating that ATC has sold zero pop-up coolers in the United States since February 2002).

## II. PROCEDURAL HISTORY

### A. Florida Action

TPI filed suit in the Southern District of Florida (the "Florida Action") against Elite on December 5, 2001, seeking a declaratory judgment that the '569 Patent was not infringed, was invalid, and/or was unenforceable, or, in the alternative, that TPI's exclusive licensing agreement with Elite was still in full force and effect. *See* Complaint for Declaratory Relief, 01 Civ. 7837, Ex. A to 2/6/03 Declaration of Roger Thompson in Support of Defendants' Motion to Transfer.[10]

On or about April 25, 2002, Elite moved to dismiss the Florida Action for lack of personal jurisdiction, improper venue, and failure to state a cause of action upon which relief can be granted. Then, on June 28, 2002, TPI moved to enjoin Elite from prosecuting the instant New York action, which Elite had instituted on June 24, 2002. Lastly, on July 17, 2002, Elite moved to dismiss for lack of subject matter jurisdiction, arguing that the January 9, 2002 Settlement Agreement between Elite and TPI granted a covenant of non-suit to TPI, which divested the court of jurisdiction.

6. The idea for a pop-up cooler was first conceived by Cihanek in 1993 or 1994 in response to a request by Stouffers Frozen Foods to "come up with a way to encourage people to buy their frozen foods." Tr. at 5–6 (Cihanek). Cihanek later shared his idea with Pepsi and Gatorade. *Id.* at 7; *see also* 3/3/95 Drawings presented to Pepsi ("Pepsi Drawings"), Def. Ex. 1.

7. Pursuant to the terms of the August 12, 1999 Settlement Agreement, Elite instituted an arbitration proceeding against Cihanek for breach of that agreement. A hearing was scheduled before the American Arbitration Association on January 21, 2003, at which time Cihanek defaulted. *See* Horowitz Supp. Decl. ¶ 12; Tr. at 57 (Cihanek).

8. Since June 2002, TPI has paid Cihanek $4,000 per month pursuant to a contract providing that Cihanek's company, Market to One, Inc., would "actively market and procure customer leads and sales for TPI's products." 6/28/02 Agreement between Cihanek and Schwarz, Pl.Ex. 10; *see also* Tr. at 22, 26 (Cihanek). Cihanek admits that this commission rate is higher than the standard 5–10% of sales and does not relate to specific sales. *See* Tr. at 29.

9. TPI admits that it continued to manufacture merchandisers after July 27, 2001, and continued to pay Elite royalties on those sales, which Elite accepted. *See* Def. Mem. at 4.

10. TPI also brought claims for unjust enrichment, fraud in the inducement of the License, and tortious interference. *See id.*

All of the motions in the Florida Action were referred to Magistrate Judge Lorana Snow, who issued a series of Reports and Recommendations ("R & Rs") on December 20, 2002. On February 11, 2003, the Florida district court dismissed the Florida Action for improper venue and transferred the action to this Court. *See* Order on Report and Recommendation ("Fla.Order"), *Thomas Plastics, Inc. v. Moshe Horowitz and Elite Licensing, Inc.*, 01 Civ. 7837 (Feb. 12, 2003). TPI filed a motion for reconsideration of the Florida Order, which was denied on February 14, 2003. *See* Order on TPI's Emergency Motion for Reconsideration of Order Transferring Action to the Southern District of New York, *Thomas Plastics* (Feb. 14, 2003).

### B. New York Action

On June 24, 2002, Elite filed an infringement action in this Court,[11] seeking expedited discovery in contemplation of moving for a preliminary injunction. *See* Thompson Dec. ¶ 4. This Court granted Elite's application for expedited discovery, whereupon Elite conducted written discovery, inspected the accused products, and conducted a Rule 30(b)(6) deposition of Larry Schwarz. *See id.* ¶¶ 5–10.

On or about August 2, 2002, TPI moved to dismiss the action for lack of personal jurisdiction, but later withdrew the motion. On January 21, 2003, defendants filed their Answer.

Approximately three months after the close of expedited discovery, on December 19, 2002, Elite filed the instant motion for preliminary injunctive relief. On January 27, 2003, defendants filed a cross-motion to transfer or stay the action. Defendants' cross-motion was denied by this Court on February 19, 2003. *See* Memorandum Opinion and Order, *Elite Licensing*, 02 Civ. 4847 (Feb. 19, 2003).

Following the February 21, 2003 preliminary injunction hearing, TPI submitted supplemental authority to support one of its defenses. *See* 2/24/03 Citation of Supplemental Authority in Support of Defendants' Response in Opposition to Plaintiffs' Motion For Preliminary Injunction ("Def. Post–Hearing Br."). By letter dated February 25, 2003, Elite responded to TPI's post-hearing submission. *See* 2/25/03 Letter to Court from Pavane ("Pl. Post–Hearing Br.").

On March 5, 2003, the parties again supplemented the record, this time in response to a directive from this Court to address the meaning of two terms at issue in the litigation. *See* Defendants' Response to Judicial Inquiry Regarding Claim Construction of the Term "Defining" in Claim 15 of the '569 Patent and Regarding the Term "Developed" of the General Terms of the Engagement Document ("Def. 3/5/03 Resp."); Plaintiffs' Supplemental Submission Re: "Defining" and "Developed" ("Pl. 3/5/03 Resp.").

### III. LEGAL STANDARD

■ Injunctive relief in patent cases is authorized by 35 U.S.C. § 283 (1988). "Whether a preliminary injunction should issue" in a patent case "turns upon four factors: (1) the movant's reasonable likelihood of success on the merits; (2) the irreparable harm the movant will suffer if preliminary relief is not granted; (3) the balance of hardships tipping in its favor; and (4) the adverse impact on the public interest." *Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1555 (Fed.Cir.1994) (ci-

**11.** The complaint additionally alleges false designation of origin and unfair competition under the Lanham Act, as well as unfair com- petition under state law. *See* Complaint ¶¶ 33–48.

tation omitted). "These factors, taken individually, are not dispositive; rather, the district court must weigh and measure each factor against the other factors and against the form and magnitude of the relief requested." *Hybritech, Inc. v. Abbott Labs.*, 849 F.2d 1446, 1451 (Fed.Cir. 1988). The burden is on the movant to show entitlement to a preliminary injunction. *See Reebok Int'l*, 32 F.3d at 1555.

## IV. DISCUSSION

### A. Likelihood of Success on the Merits

"In order to demonstrate a likelihood of success on the merits, [the patentee] must show that, in light of the presumptions and burdens that will inhere at trial on the merits, (1) [the patentee] will likely prove that [the defendant] infringes the [ ] patent, and (2) [the patentee's] infringement claim will likely withstand [defendant's] challenge[ ] to the validity and enforceability of the [ ] patent." *Amazon.com v. Barnesandnoble.com*, 239 F.3d 1343, 1350 (Fed.Cir.2001) (citing *Genentech, Inc. v. Novo Nordisk, A/S*, 108 F.3d 1361, 1364 (Fed.Cir.1997)).

Elite contends that it is likely to succeed on the merits because the accused merchandisers infringe Claim 15 of the '569 Patent—*i.e.*, the merchandisers include each and every element of Claim 15. *See* Memorandum of Law in Support of Motion for Preliminary Injunction ("Pl.Mem.") at 10. Elite argues, in the alternative, that the doctrine of "marking estoppel" bars TPI from denying infringement. *See id.* at 16–17.

TPI contends that Elite cannot sustain its burden of showing reasonable likelihood

of success on the merits because there is "a substantial question regarding the validity/unenforceability" of the '569 Patent. Def. Mem. at 8. TPI also argues that, even if Elite can establish that its patent is valid, TPI has not infringed Claim 15 because two elements of the claim cannot be found in the accused device, *see id.* at 11–13.[12]

### 1. Infringement

An assessment of the likelihood of infringement, like a determination of patent infringement at a later stage in the litigation, requires a two-step analysis. " 'First, the claim must be properly construed to determine its scope and meaning. Second, the claim as properly construed must be compared to the accused device or process.' " *Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc.*, 214 F.3d 1302, 1306 (Fed.Cir,2000) (internal citations omitted). "In order for a court to find infringement, the plaintiff must show the presence of every element or its substantial equivalent in the accused device." *Wolverine World Wide, Inc. v. Nike, Inc.*, 38 F.3d 1192, 1199 (Fed.Cir.1994).

### a. Claim Construction

In construing patent claims, courts should look first to the intrinsic evidence of the record—"the patent itself, . . ., the specification, and, if in evidence, the prosecution history." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir.1996). Within the intrinsic evidence, there is a "hierarchy of analytical tools." *Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1344 (Fed.Cir.1998).

*First,* courts look to the words of the claim itself. *See id.* ("The actual

---

**12.** TPI additionally argues that Elite's covenant of non-liability, which settled all infringement claims for products manufactured up to January 9, 2002, "runs with the prod-

uct" because TPI continued to manufacture the same product after that date. *See* Def. Mem. at 14. There is absolutely no support in the law for this proposition.

words of the claim are the controlling focus."). Unless a "special definition of the term is clearly stated in the patent specification or file history," words in a claim are given their ordinary and customary meaning. *Display Techs., Inc. v. Paul Flum Ideas, Inc.,* 75 F.Supp.2d 283, 290 (S.D.N.Y.1999) (citing *Vitronics,* 90 F.3d at 1582). "A technical term used in a patent document is interpreted as having the meaning that it would be given by persons experienced in the field of the invention, unless it is apparent from the patent and the prosecution history that the inventor used the term with a different meaning." *Hoechst Celanese Corp. v. BP Chems. Ltd.,* 78 F.3d 1575, 1578 (Fed.Cir.1996). Judges are free to consult technical treatises and dictionaries at any time to help determine the meaning of claim terms. *See Vitronics,* 90 F.3d at 1584 n. 6.

■■■■ *Second,* "it is always necessary to review the specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning." *Id.* at 1582. The specification "acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication." *Id.* "Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id. Third,* the record of all the proceedings before the PTO may be helpful. *See Display Techs.,* 75 F.Supp.2d at 290.

■■■■ Although the "specification and prosecution history can provide relevant information about the scope and meaning" of particular words in a claim, "claims are not to be interpreted by adding limitations appearing only in the specification." *Electro Med. Sys., S.A. v. Cooper Life Sci., Inc.,* 34 F.3d 1048, 1054 (Fed.Cir.1994); *see also SRI Int'l v. Matsushita Elec. Corp.,* 775 F.2d 1107, 1121 n. 14 (Fed.Cir. 1985) ("Specifications teach. Claims

claim."). Thus, although the specification may suggest that certain embodiments are preferred, embodiments that appear in, but are not required by, a specification should not be read into claims with language that is broader than such embodiments. *See Electro Med.,* 34 F.3d at 1054 (citing *Specialty Composites v. Cabot Corp.,* 845 F.2d 981, 987 (Fed.Cir.1988)).

The parties disagree on the meaning of the terms "air plenum" and "partition" in Claim 15. Claim 15 calls for:

a partition disposed in said interior chamber for defining an air plenum on one side of said partition and a rack receiving chamber on the opposing side of said partition, said air plenum and said rack-receiving chamber being in fluid communication with each other such that cooled air can be channeled through said air plenum and into said rack-receiving chamber.

*See* '569 Patent at column 8, lines 6–33.

■■■■ The words of the claim itself make clear that an "air plenum" refers to an air flow passage through which cooled air travels to an adjacent dispensing rack. Because the patent specification and prosecution history do not give the term "air plenum" any special meaning, it must be given its ordinary meaning. The best place to look for that meaning is a technical dictionary. *See Texas Digital Sys., Inc. v. Telegenix, Inc.,* 308 F.3d 1193, 1203 (Fed.Cir.2002) (acknowledging that dictionaries "may be the most meaningful sources of information to aid judges in better understanding ... the terminology used by those skilled in the art"). The ordinary meaning of the word "plenum" used in the heating, ventilating, and air-conditioning ("HVAC") field is an "air flow passage". Home Energy Magazine Online *DUCTIONARY,* Ex. H to Thompson Dec. (defining "plenum" as an "air flow passage

made of duct board, metal, drywall, or wood" that "joins supply and return ducts with HVAC equipment"); *see also* Word-Net 1.6 (1997), *available at* http://dictionary.reference.com /search?q=plenum (defining "plenum" as "an enclosed space in which the air pressure is higher than outside"). This definition is consistent with the use of the term in Claim 15. However, the claim language includes one limitation—that cooled air be able to travel through the air plenum to an adjacent rack-receiving chamber. Thus, the definition of the term "air plenum" in Claim 15 of the '569 Patent must include this limitation.

■ The meaning of "partition" in Claim 15 is an interior wall that forms an air plenum on one side and a rack-receiving chamber on the other. The ordinary meaning of "partition" is "an interior wall dividing one part of a structure (as a house, room, or enclosure) from another." *Webster's Third New Int'l Dictionary of the English Language Unabridged* at 1647 (2002), Ex. N to Thompson Dec. This meaning is consistent with the use of the term "partition" in the patent, specification, and prosecution history. However, Claim 15 further specifies that the "partition" must "defin[e]" the space inside the interior chamber into an air plenum on one side and a rack-receiving chamber on the other side. Thus, it is necessary to construe the term "define" (or "defining") as well.

In this case, the Court must look first to the patent specification because it assigns a particular meaning to the term "defining" in Claim 15. The specification states that the air plenum is "formed" by the rear wall and the partition,[13] *see* '569 Patent at column 4, lines 53–54, thereby using "formed" as a synonym for the term "defined" in Claim 15. This definition, with slight variations, is found in many dictionaries. *See, e.g., The American Heritage Dictionary of the English Language* (4th ed.2000), Ex. A to 3/5/03 Third Declaration of Roger Thompson ("Thompson Third Dec.") (indicating that one meaning of the term "define" is "to delineate the outline or form of"); *Random House College Dictionary* at 348 (rev. ed.1975), Ex. A to Thompson Third Dec. (stating that one meaning of the term "define" is "to make clear the outline of form of"). Thus, in order to infringe Claim 15, the partition must "form" an air plenum on one side and a rack-receiving chamber on the other.[14]

### b. Comparison to the Accused Device

For a patent claim to be infringed, every limitation in the claim must be found in the accused device. *See Johnston v. IVAC Corp.*, 885 F.2d 1574, 1577 (Fed.Cir.1989). Elite argues that the accused merchandiser contains every element of Claim 15.[15]

13. If the air plenum is "formed" by the partition, then the rack-receiving chamber must also be "formed" by the partition because the claim recites that the partition "defin[es]" *both* the air plenum and the rack-receiving chamber.

14. Although the diagram in the patent shows the partition extending from one side wall of the merchandiser to the opposite side, nothing in the patent, specification, or prosecution history suggests that the partition *must* extend from one side wall of the merchandiser to the opposite side wall. Likewise, the existence of

vent holes in the partition is a preferred embodiment, not a requirement. *See* '569 Patent at column 4, lines 34–36 ("[T]he merchandiser *may* include ventilation openings, such as lower vent holes and upper vent holes in the . . . partition."). Thus, contrary to TPI's suggestions, *see* Def. Mem. at 11–13, these limitations are merely preferences, which cannot be read into the claim.

15. In so doing, Elite relies on two drawings of TPI's coolers prepared by Horowitz, Elite's own president. *See* Ex. I to Thompson Dec. On cross examination, Tombs conceded that

*See* Pl. Mem. at 10. TPI contends that its pop-up coolers have neither a partition nor an air plenum because the part that Elite identifies as a "partition", which TPI calls an "evaporator cover", does not "define" an air plenum on one side and a rack-receiving chamber on the other. *See* Def. Mem. at 13.

 Figure 3.3 of the Manual illustrates that TPI's coolers do indeed have a partition that divides the space inside the housing in two, *forming* an air plenum on one side and a rack-receiving chamber on the other side. *See* Manual at 8; *see also* Schwarz Dep. at 153 (agreeing that the "evaporator cover serves to define" an area on one side of the cover where the cold air is generated and an area on the other side where the dispensing rack is located). The fact that the "evaporator cover" is not attached to the rack receiving chamber is insignificant. *See* Tr. at 105–06 (Tombs) (indicating that there is a gap between the "evaporator cover" and the rack-receiving chamber in TPI's coolers). In order to "form" the rack-receiving chamber, the "evaporator cover" need not touch the chamber so long as it delineates the space in which the chamber sits. More importantly, the rack in the patented cooler is not secured to the partition.[16] *See id.* at Figure 3. Even if the rack were described in the specification as being affixed to the partition, such limitation cannot not be read into the claim. Thus, the accused device includes all of the limitations of Claim 15. Elite is therefore likely to prevail on its literal infringement claim.

### c. Marking Estoppel

 Even if Elite were unable to prove literal infringement, TPI would be estopped from denying infringement under the equitable doctrine of patent marking estoppel. Under this doctrine, where a party knowingly and deliberately marks its product with a patent number for a period of years, thereby representing to the public that the product is covered by the patent, that party is estopped from later denying in an infringement suit that the product is covered by the patent. *See Boyd v. Schildkraut Giftware Corp.*, 936 F.2d 76, 79 (2d Cir.1991); *see also Keller v. Clark Equip. Co.*, 210 U.S.P.Q. 742, 758, 1981 WL 40526 (D.N.D.1981) (listing cases in which doctrine of marking estoppel has been applied), *aff'd,* 715 F.2d 1280 (8th Cir.1983).

Here, the products sold by TPI under its License with Elite were all marked with the '569 Patent number. *See* Thompson Dec. ¶ 5; Tr. at 91 (Tombs). TPI also included the '569 Patent number in its advertising literature. *See* Thompson Dec. ¶ 6; Pop–Up Advertisements, Ex. F to Thompson Dec. Moreover, TPI paid over $3,600,000 in royalties for the use of the '569 Patent and enjoyed the benefits of its exclusivity by selling over $60,000,000 worth of licensed merchandisers over the four-year term of the License. It was only after TPI learned that its license with

---

these drawings contain several inaccuracies. *See* Tr. at 102–05 (Tombs) (acknowledging, among other things, that the drawings fail to show that cool air flows to the bottom of the cooler, fail to illustrate the existence of a gap between the "partition" and the rack-receiving chamber, and incorrectly suggest that there is a metal connection between the "partition" and the rack-receiving chamber). The Court will therefore rely exclusively on the diagrams in TPI's owner's manual for pop-up coolers. *See* MRI Pop–Up Refrigerated Cooler Standard Model Owner's Manual ("Manual"), Ex. M to Thompson Dec.

16. One side of the bottom of the rack sits on a stop affixed to the partition, but no part of the rack is affixed to the partition itself. *See* '569 Patent at column 4, lines 37–40.

Elite would not be renewed, that TPI claimed for the first time that the merchandisers that it had been selling for four years were not covered by the '569 Patent.

Having asserted for years that the accused merchandisers are covered by the '569 Patent and reaped the benefits of that protection, it would be inequitable to allow TPI to now assert that those merchandisers are not covered by the patent at issue.[17] *See Boyd,* 936 F.2d at 79 (holding that marking estoppel applies where defendant's conduct "makes it inequitable for him to take a position contrary to his prior statements or actions"); *see also Dwight & Lloyd Sintering Co. v. American Ore Reclamation Co.,* 44 F.Supp. 401, 402 (S.D.N.Y.1941) (finding defendant is estopped from denying that its machines infringed plaintiff's patents because the plates on the machines referred to some of plaintiff's patents and defendant made payments to plaintiff for the use of the patents). Thus, TPI is estopped from denying that it infringed the '569 Patent.

### 2. Validity

■■■■■ A patent enjoys a presumption of validity. *See* 35 U.S.C. § 282. While the burden of proving the invalidity of a patent rests on the party asserting such invalidity, the party seeking the injunction retains the burden of showing a reasonable likelihood that the attack on its patent's validity will fail. *See Oakley, Inc. v. Sunglass Hut Int'l,* 316 F.3d 1331, 1339 (Fed. Cir.2003) (citing *H.H. Robertson Co. v. United Steel Deck, Inc.,* 820 F.2d 384, 387 (Fed.Cir.1987)). "[T]he injunction should not issue if the party opposing the injunction raises a 'substantial question concerning infringement or validity.' " *Oakley,*

316 F.3d at 1340 (quoting *Tate Access Floors, Inc. v. Interface Architectural Resources, Inc.,* 279 F.3d 1357, 1365 (Fed.Cir. 2002)).

■■■■■ TPI argues that the '569 Patent is invalid and unenforceable because it was procured through inequitable conduct and fraud. *See* Def. Mem. at 9–10. TPI claims, in particular, that Elite Marketing and Horowitz fraudulently asserted ownership of the invention to the PTO because: 1) Cihanek never signed the Engagement document that Elite Marketing filed with its patent application, *see id.* at 9; and 2) the invention does not fall within the scope of the employment agreement because it was invented prior to Cihanek's employment at Elite Marketing, *see id.* at 9.

#### a. Inequitable Conduct

■■■■■ Inequitable conduct includes "affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive." *Molins PLC v. Textron, Inc.,* 48 F.3d 1172, 1178 (Fed.Cir.1995). The defense of inequitable conduct is equitable in nature. *See Paragon Podiatry Lab. Inc. v. KLM Labs., Inc.,* 984 F.2d 1182, 1190 (Fed.Cir. 1993).

■■■■■ Determination of inequitable conduct requires a two-step analysis. "First, the trial court must determine whether the conduct meets a threshold level of materiality. The trial court must then also determine whether the evidence shows a threshold level of intent to mislead the PTO." *Perseptive Biosystems, Inc. v. Pharmacia Biotech, Inc.,* 225 F.3d 1315, 1318–19 (Fed.Cir.2000) (citations omitted).

---

17. The fact that TPI has now stopped marking its coolers with the '569 Patent number is insignificant. "[D]iscontinuance of marking [does] not obviate or cure the estoppel."

*Crane Co. v. Aeroquip Corp.,* 364 F.Supp. 547, 560 (N.D.Ill.1973), *rev'd on other grounds,* 504 F.2d 1086 (7th Cir.1974).

"Once the threshold levels of materiality and intent have been established, the trial court is required to weigh materiality and intent." *Id.* The more material the conduct, the less evidence of intent will be required to find that inequitable conduct has occurred. *See N.V. Akzo v. E.I. Dupont de Nemours,* 810 F.2d 1148, 1153 (Fed.Cir.1987). "In light of all the circumstances, the court must then determine whether the applicant's conduct is so culpable that the patent should be held unenforceable." *Perseptive Biosystems,* 225 F.3d at 1319 (citing *LaBounty Mfg., Inc. v. United States Int'l Trade Comm'n,* 958 F.2d 1066, 1070 (Fed.Cir.1992)).

Elite and Horowitz did not intentionally misrepresent their ownership rights in the merchandiser. The evidence presented on this motion overwhelmingly suggests that Cihanek did, in fact, sign the Engagement document. *First,* Elite has produced a witness, Hanze, who claims he saw Cihanek sign the document, whereas TPI relies solely on Cihanek's self-serving affidavit. *Second,* all employees of Elite Marketing were required to sign the document as a condition of employment. *See* Tr. at 66 (Hanze). It is unlikely that the company would have permitted Cihanek to begin employment if he had refused to sign the document, especially if he had already begun developing the idea for the merchandiser, as he claims. *Third,* Cihanek did not object when he was informed of the PTO's acceptance of Elite's Rule 47 Petition, which included a copy of the signed Engagement agreement. *Fourth,* Cihanek did not object to having signed the document when he was informed by Elite's counsel that any use or disclosure of the merchandiser to his then employer, P.O.P. Inc., would constitute a violation of his employment agreement. *See* 3/1/96 Letter to Cihanek from Pavane re Employment Agreement Dispute, Pl.Ex. 13.

The evidence regarding whether the employment agreement conferred rights to the invention on Elite, however, is not as conclusive. The contract provides, in pertinent part, that "[a]ll products ... *developed* by the Company, including all trade secrets, formulas, procedures, process and know-how relating thereto ('the Products'), in connection with which the undersigned otherwise becomes familiar shall be owned by and belong exclusively to the Company, and the undersigned shall not have any personal interest therein." Engagement Document (emphasis added). One common definition of the word "develop" is "to bring to a more advanced or effective state." *Random House* at 363, Ex. B to Thompson Third Dec. *See also American Heritage,* Ex. B to Thompson Third Dec. ("to cause to become more complex or intricate; add details and fullness to; elaborate"); *Webster's Dictionary* at 618, Ex. B to Thompson Third Dec. ("to ... advance from a simple form or state of existence to one more complex either in structure or function"). The extent to which the pop-up cooler was developed or advanced by Elite Marketing during Cihanek's tenure at the company is unclear from the record.

Cihanek unquestionably conceived of the idea for pop-up coolers prior to his employment at Elite Marketing. *See* Tr. at 6–7 (Cihanek) (testifying that, as early as 1994, he began explaining his idea for a pop-up cooler to Stouffers Frozen Foods, Gatorade, and Pepsi). He does not appear, however, to have done much at that time to reduce his idea to practice. The drawings that Cihanek showed to Pepsi depict only the outside of a merchandiser, showing no details of how the merchandiser would work. *See* Pepsi Drawings. When asked if he had "built any prototypes or done any development work on the pop-up cooler" prior to joining Elite Marketing in June of 1995, Cihanek re-

sponded that there was a blank shell to demonstrate the size of the coolers and "there might have been a spring in one compartment to get the idea across," but that he doesn't recall whether there was anything more. Tr. at 32 (Cihanek).

When questioned about Elite Marketing's development of the pop-up coolers during his tenure, Cihanek's answers were equally vague. In response to the question, "And while you were with Elite Marketing, did you do any work with anyone at Elite Marketing concerning development of th[e] pop-up cooler device?", Cihanek responded "yeah", *id.* at 31, but did not explain the nature of such development work.[18] It is clear, however, that the diagrams and text for the patent application were prepared while Cihanek was employed by Elite Marketing.[19] *See* Invoice (detailing legal services rendered from 9/7/95 through 1/16/96 in connection with '569 Patent Application). Thus, it appears as if Cihanek's idea was brought to a more advanced state and therefore "developed" during Cihanek's tenure at Elite Marketing.

Even if Elite Marketing did not "develop" the invention while Cihanek was employed there, TPI cannot prove inequitable conduct. There is absolutely no evidence to suggest that Elite Marketing and Horowitz intended to deceive the PTO. The only way Elite Marketing and Horowitz could have had such intent is if they submitted

the Engagement document to the PTO with knowledge that the document did not legitimately confer rights to the merchandiser on Elite. The evidence suggests, however, that Elite Marketing and Horowitz believed that the Engagement document effectively conveyed to them the rights to the invention, which is why they insisted on having employees sign the document as a condition of employment. *See* Draft of Engagement Document and Work–for–Hire Document, Ex. 2 to Def. 3/5/03 Resp. (demonstrating Elite Marketing's intent that employees convey ownership of "all and any portion" of their development of intellectual property, including ideas, to the company). Although Elite Marketing and Horowitz may have mistakenly construed the contract language to afford themselves rights to which they were not entitled, this mistake is not grounds for patent invalidity. *See Canon Computer Sys., Inc. v. Nu–Kote Int'l, Inc.,* 134 F.3d 1085, 1089 (Fed.Cir.1998) ("Incorrect inventorship is a technical defect in a patent that may be easily curable"); *Pannu v. Iolab Corp.,* 155 F.3d 1344, 1350 (Fed.Cir.1998) (acknowledging that upon a finding of a mistake in inventorship, a patentee may invoke section 256 to save the patent from invalidity).

### b. Fraud

"Fraud in the procurement of a patent requires proof of the elements of

---

**18.** TPI contends that it "did all the development work" on the pop-up coolers including research and the building of a commercial prototype, which cost the company approximately $250,000 and took about six months. *See* Tr. at 141 (Schwarz).

**19.** Cihanek was employed as a salesman. *See* Cihanek Aff. ¶ 9 (stating that his job duties involved sales—not product engineering or design); Def. Ex. 3 (indicating that Cihanek's title at Elite Marketing was "Vice President/Account Development"). Nonetheless,

the record suggests that Cihanek assisted with the development of Elite's patent application. *See* 1/31/96 Invoice for Legal Services Rendered in Connection with the '569 Patent ("Invoice"), Ex. D to Thompson Third Dec. (indicating that Elite's counsel conferred with Cihanek on multiple occasions throughout the preparation of the '569 Patent application); 9/28 Handwritten Note re Patent Application, Ex. C to Thompson Third Dec. (demonstrating that Elite's counsel contacted Cihanek for guidance regarding the patent application).

fraud as developed in the common law: (1) that a false representation of a material fact was made; (2) with the intent to deceive; (3) which induced the deceived party to act in justifiable reliance on the misrepresentation; and (4) which caused injury that would not otherwise have occurred." *C.R. Bard, Inc. v. M3 Systems, Inc.*, 157 F.3d 1340, 1364 (Fed.Cir.1998) (citations omitted). With respect to patent prosecution, "fraud requires (1) a false representation or deliberate omission of a fact material to patentability; (2) made with the intent to deceive the patent examiner; (3) on which the examiner justifiably relied in granting the patent; and (4) but for which misrepresentation or deliberate omission the patent would not have been granted." *Id.* A finding of fraud can of itself render the patent unenforceable. *See id.*

 Because TPI cannot demonstrate that Elite Marketing and Horowitz had the requisite intent to deceive the patent examiner, TPI will be unable to

establish patent invalidity or unenforceability on the basis of fraud. Thus, Elite has met its burden of showing a reasonable likelihood that TPI's attack on the '569 Patent's validity will fail.[20]

### B. Irreparable Harm

 If a patentee makes a "clear" or "strong" showing of patent infringement and validity in a preliminary injunction proceeding, irreparable harm is presumed. *See H.H. Robertson*, 820 F.2d at 390; *Smith Int'l, Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1581 (Fed.Cir.1983). "The kind of strong showing that raises the presumption is, for example, ... the failure of the alleged infringer to present any relevant evidence contesting the patent's validity." *Tennant Co. v. Hako Minuteman, Inc.*, 651 F.Supp. 945, 961 (N.D.Ill.1986). Where, however, the alleged infringer has raised a "bona fide" question of invalidity, there can be no "clear showing of validity." *Id.* Elite has made a clear showing that it

---

**20.** TPI raised an additional invalidity defense at the preliminary injunction hearing—the "on sale bar" pursuant to 35 U.S.C. § 102(b). *See* Tr. at 189–190; Def. Post–Hearing Br. at 1. This defense is likewise unavailing. The "on sale" bar requires: (1) the invention to have been the subject of a "commercial offer for sale"; and (2) the inventor to have reduced the invention to practice before the critical date or to have "prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." *Pfaff v. Wells Elec., Inc.*, 525 U.S. 55, 67–68, 119 S.Ct. 304, 142 L.Ed.2d 261 (1998), *reh'g denied*, 525 U.S. 1094, 119 S.Ct. 854, 142 L.Ed.2d 707 (1999).

The evidence offered by TPI does not establish a substantial question as to either prong of the *Pfaff* test. There is no evidence on this record that Cihanek made a "commercial offer for sale" to Pepsi—that is, that Cihanek presented Pepsi with terms sufficient to formulate a contract, such as a firm price or delivery dates, rather than mere ideas. *See Group One, Ltd. v. Hallmark Cards, Inc.*, 254

F.3d 1041, 1048 (Fed.Cir.2001) ("Only an offer ... which the other party could make into a binding contract by simple acceptance ... constitutes an offer for sale under § 102(b)."); *Rhenalu v. Alcoa, Inc.*, 224 F.Supp.2d 773, 804 (D.Del.2002) (finding no "commercial offer for sale" where the alleged "offer" lacked terms necessary to form a contract—*e.g.*, quantity, time, and place of delivery). There is also no evidence that Cihanek reduced the invention to practice or showed Pepsi drawings sufficiently specific to enable a person skilled in the art to practice the invention. The drawings introduced by TPI fail to show any part of the interior of the illustrated merchandiser. *See* Pepsi Drawings.

Moreover, there is strong evidence to suggest that the invention was *not* on sale one year before the filing date of the patent application. In an affidavit attached to the August 12, 1999 Settlement Agreement, Cihanek swore that the invention was not on sale more than one year prior to the filing date of the '569 Patent. *See* 8/12/99 Affidavit of Lawrence Cihanek, Exhibit to Pl. Post–Hearing Br., ¶ 4.

will prevail on the issue of infringement and TPI has failed to present any relevant evidence to contest invalidity. Thus, irreparable harm is presumed.

In any event, Elite can demonstrate that it is suffering actual and continuing irreparable injury as a consequence of TPI's continuing infringement. Elite is a small business that is limited to the licensing and exploitation of the '569 Patent. *See* Pl. Mem. at 18. Elite alleges that most potential domestic customers, who have purchased the patented merchandisers for years from TPI, have refused to change suppliers so long as TPI is allowed to sell the accused merchandisers to them. *See* Tombs Dec. ¶ 16. Consequently, Elite has been unable to secure customers in the domestic marketplace for its own patented merchandisers. *See id.* ¶ 17; *see also* Tr. at 79 (Tombs). Such exclusion is likely to continue absent injunctive relief from this Court.

TPI argues that Elite has not demonstrated actual irreparable harm because it delayed in seeking the injunction by waiting six months after the filing of this action and three months after the close of discovery. *See* Def. Mem. at 16–17. Delay in seeking preliminary injunctive relief for alleged infringement cuts against a patent owner's claim of irreparable harm. *See Polymer Tech., Inc. v. Bridwell*, 103 F.3d 970, 974 (Fed.Cir.1996) (noting that the presumption of irreparable harm may be rebutted by evidence that the movants unduly delayed in bringing suit) (citing *T.J. Smith & Nephew Ltd. v. Consolidated Med. Equip., Inc.*, 821 F.2d 646, 648 (Fed. Cir.1987)). It is reasonable—and not inconsistent with a showing of irreparable harm—for Elite to have waited until after the close of the three month discovery period to file its motion. It is not clear, given the gravity of Elite's alleged situation, why it waited an additional three

months. In any event, when weighed against the other factors, upon which Elite has made a strong showing, a delay of an extra three months does not warrant the denial of the relief sought here.

## C. Balance of Hardships

"In considering the balance of hardships, the Court must balance the harm that will occur to the moving party from the denial of the preliminary injunction with the harm that the non-moving party will incur if the injunction is granted." *Drexelbrook Controls, Inc. v. Magnetrol Int'l, Inc.*, 720 F.Supp. 397, 408 (D.Del.1989) (citing *Hybritech*, 849 F.2d at 1457), *aff'd*, 904 F.2d 45 (Fed.Cir.1990). The magnitude of the threatened injury to the patent owner should be considered in light of the strength of the showing of the likelihood of success on the merits. *See H.H. Robertson*, 820 F.2d at 390.

The balance of equities tips in favor of Elite. If an injunction does not issue, Elite, whose sole business is the exploitation of the '569 Patent, will continue to be foreclosed from the marketplace. Conversely, if an injunction does issue, TPI will suffer lost profits requiring layoffs, but the harm is likely to be less significant than the harm to Elite because TPI can continue to sell its many other products that do not infringe the '569 Patent. *See* Tr. at 154 (Schwarz) (indicating that pop-up coolers represent 15–20% of TPI's annual sales).

## D. Public Interest

The public interest favors the protection of the rights secured by valid patents. *See Smith Int'l*, 718 F.2d at 1581. Because Elite has demonstrated that it is likely to withstand TPI's challenge to the '569 Patent's validity, this factor also cuts in favor of Elite.

## V. BOND

 Federal Rule of Civil Procedure 65(c) provides that "[n]o ... preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper...." The phrase "in such sum as the court deems proper" vests the district court with wide discretion in the matter of security. *See Doctor's Associates, Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir.1996). The district court may dispense altogether with the filing of a bond where there has been no proof of likelihood of harm. *See Ferguson v. Tabah*, 288 F.2d 665, 675 (2d Cir.1961) (citations omitted). The party against whom a preliminary injunction is sought has the burden of establishing the amount of a bond necessary to secure against the wrongful issuance of the injunction. *See Doctor's Associates*, 85 F.3d at 985.

TPI argues that a bond in the amount of $61,000,000 is necessary as a precondition to the issuance of a preliminary injunction. *See* Schwarz Dec. ¶ 13. While TPI has demonstrated that it will suffer harm as a result of an injunction, thereby warranting the issuance of a bond, it has failed to establish the amount required for such a bond. The amount requested by TPI reflects its gross sales of pop-up coolers during the four years of its exclusive license with Elite. TPI provides no explanation why this amount reflects the company's potential damages if an injunction were improvidently granted.[21] It is hard to believe that TPI will lose, during the relatively short period of time that is likely to elapse between the issuance of an injunction and a decision on the merits, as much money as it *grossed* during *four years* of sales of the pop-up coolers. The more appropriate amount for a bond is TPI's profits during the approximately six months that it will take this case to move towards trial, which this Court estimates at $500,000.

## VI. CONCLUSION

For the reasons set forth above, Elite's motion for a preliminary injunction is hereby granted. Plaintiffs are ordered to issue a bond in the amount of $500,000. A conference is scheduled for March 25, 2003 at 3:00 p.m. The clerk is directed to close the motion.

---

21. TPI has provided evidence that its projected sales for the next 18 to 24 months is $ 8–10 million, $ 2.5 million of which will come from sales of pop-up coolers. *See* Tr. at 149 (Schwarz). It has failed, however, to provide information regarding expected profits.